The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and its unruly court. Thank you. This is it. Good morning, everyone. The argued case this morning is number... Let's see, does it have a number? Docket number 95121, Arkansas Game and Fish Commission against the United States, Mr. Lundman. If you may please report, Robert Lundman representing the United States. I'd like to reserve four minutes for rebuttal. The Supreme Court in this case has ruled simply and only that government-induced flooding temporary in duration gains no automatic exemption from takings clause inspection. The court explained the analysis should be situation-specific and set forth the relevant factors that guide that analysis. Then remanded to this court to apply those factors and determine the central issue in this case, whether a taking has occurred. I will also address the two other issues we raised in our appeal related to evidence foliation and dower. As for the factors in the central issue, there are four of them. The first is the duration of the flooding. The second is intent and foreseeability. The third is the character of the land and the reasonable investment expectations of the commission. And the fourth is the severity of the interference. There's no taking here because, as I'll discuss, the flooding was temporary. It was neither intentional nor foreseeable. It occurred on floodplain land that flooded regularly before the deviations, during the deviations. And it most caused only an incremental increase in flooding because that land already flooded. Now, the way you've laid out your argument, and it's laid out this way in your brief, there's something of an intermingling of factual and legal contentions. Could you, to help me at least, characterize your arguments by reference only to the legal arguments you make, by which I mean assume that we accept all of the factual findings made by the trial court. What legal arguments do you have? And leave aside, if you would, the exfoliation dower issues. It's purely on the taking. What is your legal submission to us? Our legal submission is you look at all four factors, consider them together, based on the CFC's opinion, and you still find no taking here. The CFC— Well, okay, to cut to the chase here, for example, the severity issue. Right. The trial court made factual findings on severity. So I think if we accept those factual findings, then that issue is, I think, off the table, right? I don't think so. Okay, now what's the legal reason that those factual findings are ineffective to take severity off the table? I think severity, what you look at is the severity of the interference with the land. And I think even on what the CFC found, the CFC clearly found that during the growing season, before the deviations occurred, there was regular flooding on the commission's land. And so what we have here is not dry land that was flooded for the first time or land that was rarely flooded, but regular flooding during those months, the key growing season months. But the court found, the court addressed that and said that there was a critical distinction between the pre-deviation period and the deviation period that itself was responsible for, in dimension, that was responsible for the death of many of the trees. So, I mean, that's a factual determination. You seem to be fighting that factual determination. Well, we're fighting it in this sense, is that the CFC jumped from what should be a focus on the severity of the interference. We look at the land pre-deviation, post-deviation, and look what changed with respect to the water coming on the land. The CFC looked at that, but then said, well, I know it's severe because there was a lot of damage. And that's a distinct issue. That's the calculation of powers of the land damage. But it doesn't resolve the issue of the severity of the interference. That is, as the Crest Court explained, for example, Supreme Court in Crest. But this is really a critical aspect of your appeal, because are you telling us that you want us to review the facts from the beginning and find them for ourselves? I don't remember your making an adequate case that those facts were not supported sufficiently for us to give them the appropriate deference to the trial court. Our first argument is if you take the facts that the CFC found it, it does not equal a taking under the legal standards set by the Supreme Court. Our second argument is that the CFC oversimplified factual findings. And I can get into that in a minute, but I think it's critical to take Judge Bryson's first question of, if we take the facts as the CFC found them, is it a taking? And the answer is no, because as to severity, it's the character of the invasion. And here we have land in a floodplain that's flooded regularly. Then you have a slight incremental increase in that flooding. That is not a severe interference. What that is is an incremental addition of water, at most, based on what the CFC found. Could I ask you to back up a moment? I'm quite confused about this notion that it's a taking to deviate from the original plan for the dam. It strikes me that the taking, if there is one, is the construction of the dam and the operation of the dam in a particular way. The comparison ought to be between the pre-dam situation and the situation that existed when the dam was operating. And yet everybody in the trial court treated this case as though it was a question of whether the deviations were so severe and foreseeable that there was a taking. Am I not correct that the real question is what was the situation before the dam? I think that's a critical consideration. I think you can look at both the pre-dam and pre-deviation periods and compare. I'm trying to figure out what happened here. There's some indication in the testimony and the Court of Federal Claims opinion that everybody treated the pre-deviation situation as a surrogate for the pre-dam situation. Is that fair? Well, there's this incredibly limited pre-dam data. Answer my question. Is that what happened here? I think our focus was on... I don't know if they were saying... I think there was discussion of pre-dam. There was no concession that it was irrelevant by the government. Is it fair to say that both parties treated the pre-deviation situation as a surrogate for the pre-dam situation? I don't think we treated it as a surrogate. I think we pointed out that there was no or very limited pre-dam data. And so we then did analyze... This is important for future cases. In the prior Supreme Court cases, nobody suggested that you have a property right in the operation of the dam in a particular way. The property right is what existed before the dam, and the taking is the construction and operation of the dam. Is that not correct? I think that's correct. And the key here is what we have is the court tweaking the operation of the dam in the 1990s. The dam had been in place for a long time. The manual provided for the deviations. It authorized deviations. And then the court went ahead and tried to make the dam more effective to reduce downstream flooding. And that's what the purpose... But is it also not true that you never raised in the Court of Federal Claims any objection to the comparison between the pre-deviation and post-deviation situations? You never said, oh, well, there's not enough evidence here about what existed before the dam was constructed, correct? I'm not sure if we objected to the comparison. I think we conceded that there was some relevance to it. I think we also pointed out that... And there's a footnote in the CFC, if you need a mention in which case, that points out the very limited data pre-dam. I think that is... Let's approach the question this way. The CFC made a finding that to the effect... I can't remember the exact words, but to the effect that the dam essentially mimicked or replicated natural flow more or less. Do you take issue with that finding or do you accept that finding? I think more or less. I don't think it's correct that it... In a way that was not material to any of the events at issue here. No, I think it was material. Well, then you do take issue with that finding? Well, I don't think that finding is critical to the question of whether there was a severe interference with the land, whether the dam... The question of severe interference turns on comparing the situation pre-dam and the situation post-dam with the dam being operated with the deviation. And that's the appropriate comparison under the Supreme Court cases, but nobody's ever made that comparison here. And what I'm asking is, did you ever complain in the Court of Federal Claims about the comparison that was being made between pre-deviation and post-deviation? The answer is no, right? You never complained about that. We pointed out that the pre-dam deviation was relevant. I'm not sure we objected and tried to strike all post-dam at it. I know we did not do that. I'm not sure if we... I know we did point out the pre-dam conditions were relevant and the CFC opinion... It's not relevant. It's the key to the whole thing. Well, we never argued that it was the key to the whole thing and that that was the whole analysis that should occur. We provided... But it is the analysis that should occur in cases like this, right? I think it's... As I'm saying, I think it's a very strong consideration here. It's not a strong consideration. The only taking is the construction of the dam and the operation of the dam in a particular way. So there has to be a comparison between what the situation would have been with the dam and without it, right? Right. I think that's a critical consideration. I think, for example, if their land had not been on a floodplain, had never flooded before, the Corps completely changed its deviation pattern in a completely new way. Their land flooded all summer long for the first time ever when it never flooded before. Maybe that sort of operational claim, at least it's much closer to a taking than here. What about the water rights issue that was discussed in the Supreme Court opinion that was raised in the Supreme Court amicus brief, which seems to be a pertinent background principle of property law? You never raised that in the Court of Federal Claims either, right? Well, we never pointed that out in the Court of Federal Claims. The Supreme Court's opinion is what introduced reasonable investment back and expectations in this case. We think on remand that issue is before the court and that it's fine for the court to factor in the analysis along with the fact that it's floodplain land that the whole purpose... You never raised it. That's the question. You never raised it, right? We didn't argue in the trial court that the state law... And when the Supreme Court referred to that issue, they said these are considerations which, if preserved in the trial court, would bear on the question of whether there's a taking. And so the question of whether they were preserved was not answered by the Supreme Court, right? That's right. The state law issue is a small, tiny piece of our argument. However, if it's reasonable investment backed expectations, you have to look at what they bought. But you didn't raise reasonable expectations, and I read your brief. I understand your opening brief originally before this court not to be arguing reasonable investment backed expectations, but rather severity, the portion of your brief that you refer to when you allude to expectations. We always argue that the land was downstream exam, that it was in a floodplain, and that it had been subject to flooding. Those are the facts we think are relevant to the reasonable investment backed expectations fraud, which the Supreme Court introduced into this context. This court's precedents, Rich Line, no mention of reasonable investment backed expectations. What does reasonable investment backed expectations mean? I would suppose in the context of a physical taking, which is what this is, that it would mean what background principles of property law were. Do you disagree with that? Well, we think that's one of the considerations. We also think if you buy floodplain land, you have to reasonably expect the risk of flood. What physical taking case says that? Which taking? Physical takings case says that, that the date of the acquisition is relevant. I mean there are cases that say if the taking took place before you bought the land, the cause of action doesn't get conveyed with the land, and the prior owner is the one with the suit. But this is a situation in which the deviations occurred after the commission bought the land. Well, in total Supreme Court opinion, there's no case that discusses reasonable investment backed expectations and flooding. That's the new angle in this case. So there's nothing that discusses that. I think, though, the Supreme Court has said it's relevant. This court on remand should assess it and look at two things. One, floodplain character. And two, that the dam existed at the time. The manual to provide for the dam authorized these sort of deviations. And one, downstream of the dam, 115 miles downstream of the dam, had to expect that there was going to be adjustments to the water release. And that's what we have here. We have adjustments, tweaks, in order to try to make the program more effective for downstream property owners. The other two factors would be duration is still relevant. The Supreme Court said it's not a per se rule, but it's still relevant. This court described accurately last time when it said the deviations were varied for limited periods of time, were different, and then stopped. Intent foreseeability, we've argued foreseeability in this case. It's clearly not intentional. The commission has not argued that. I talked about character of the land and investment backed expectations. And then severity of the interference. I just want to hit on that one more time here. It's critical that this land was flooding already and that the increase was only marginal or incremental. And that makes this case different from the upstream situation where you have a reservoir occupying land, a project on top of land. You have a traditional occupation appropriation. Here, their land is 115 miles downstream. The water release passes hundreds of property owners lining the banks of the river. They are simply not singled out here for different treatment. There's no evidence in the record that the commission's land is any differently singled out than all the other property owners lining the banks of the river on the way down. Let me ask you about the point you made a moment ago about the different asserted incursions attributable to the changing deviations between 93 and 99. In your brief, and I think you alluded to this point here, that there's significance, as you see it, to the fact that these were separate events motivated by separate considerations as opposed to a single event or a single consistent sequence of events driven by one original policy. You see that as making a difference. But are you familiar with the case? I think it's been cited by the parties at some point, but the Iherabide case from the Court of Claims. Yes, I read it in the last week, but I'm familiar. That case involved a variety of actions by the army, I guess it was, that effectively rendered somebody's ranch unusable. But the variety was from bombing sometimes, using it as target practice, going on to the ranch, and so forth. And what the court said in that case in response to the argument that these really were separate individual incursions is that we see no reason why combined and cumulative invasions of different types, as in this case, should not have the same effect as a single course of conduct. Why isn't that principle governed in this case? Well, I think there's two key distinctions. Those are much more direct invasions of property than we have here. Well, okay, but I'm trying to deal now with the specific argument that there's a difference between a series of events all driven by the same policy determination made at the outset versus individual incursions that occurred during that period, an argument that I think you're making. Yes. So setting aside all the other arguments, just address that argument and why this case doesn't answer that argument. Well, I think it's relevant to that argument, but it doesn't answer it. I think you have a continuum here. Our case is in the middle. You have a one-off, one-time event. That's not going to meet the duration prong. It's going to be very hard to find a taking. You have the permanent change, the sort that was addressed in Pumbley and Kress and the other, some of the Supreme Court opinions in this. And here you've got the middle ground, 1993 to 1999. Really, 1993 did not start until the last days of the growing season. So really we're talking 94 to 98 because 99 or 2000, all parties agree, the deviations had no impact. So you're talking five years with the court experimenting, trying to adjust the water control schedule in a way that maximized the value of the project. But isn't the Supreme Court telling us that those events are to be aggregated together and that we should be treating it as a single event for takings purposes? And the duration is still going to be relevant, but it's a duration of the aggregate. Well, I think the duration of the aggregate – I'm not going to say that's not relevant. I think that is relevant, but I do think it's also relevant that this was not a single approach to the problem that lasted over this period. Well, what are we supposed to do with that? Are we supposed to treat it as each year as a separate patient? I don't see how that's consistent with what the Supreme Court said. Well, the Supreme Court said time is indeed a factor. And so at a minimum you look at the fact that the impacts here were 94 to 1998. That's it. I think it's further relevant that in that period that there is discrepancy in very government action. But the Supreme Court considered the cumulative effect in terms of the injury, so that you can't separate. Well, when it comes to time to calculate damage, I think that's the right way of going about it. But I think when you're assessing severity of the interference, that is a predicate question, and there you have to look at the duration. Unless you had injury, we wouldn't be here. You can't separate them in your analysis. Well, I think you can separate them analytically in the sense that injury does not drive the whole takings analysis. Yes, I think duration is relevant, and the Supreme Court has said so. The total duration here was 94 and 98. Within that, there's variation, and I think that's relevant, too. It was not a uniform policy that was imposed in 1994 and ended at the end of 1998. All right, let's hear from the Commission. Could I ask one or two questions about that? I want to ask a couple of questions about the cruise maps and your complaints about them. As I understand it, you wanted to have the cruise maps arguing that some of the areas for which claims were asserted were, in fact, not affected by the flooding because of the elevation of those properties would have been above the flood point. Am I understanding that correctly? That's right, coupled with overlaying the cruise map data with the pre-existing damage, pre-1993 damage on the land. So both elevation change and where the damaged trees were found in the cruise maps and also comparing where the damaged trees were found and dying trees compared to pre-existing, pre-1993 problems with the timber. So is it fair to say that the information that Kingston supplied to, I guess it's Baker, is that correct? He was one of the experts, yes. That didn't show anything about elevations. It just showed we found this many healthy trees, we found this many dead trees, and it didn't indicate what the location was or the elevation. Well, it just very generally indicated location. There was no specific cruise map showing where each tree was found, which would allow that sort of detailed analysis. Were the people who did the cruises instructive at all about elevations? I don't know the answer to that. Do we know what their instructions were? I'm not sure that their instructions… They testified, did they not? The cruisers themselves did not testify. The experts that… The experts testified. They weren't asked these questions like you just don't remember or don't have memorized the transcript. I have not memorized the entire transcript. What I know came out was testimony about which direction they went, whether they went east, west, or north, south. But there was no starting point information that specified precisely where they started or then which direction beyond the general orientation of the way they headed. That's what the… One of the cruisers did testify, and he was asked whether he could reconstruct the area that was cruised. And he said, if I recall correctly, that he could reconstruct for the areas that he cruised. And he was asked whether the people who worked for him could reconstruct based on the information that was available to them, and he said yes. And so why shouldn't the government be in the position of having to request, say by interrogatory, that the areas that were cruised be reconstructed? As I understand it, the cruised areas were identified by stakes, right? I think there were some, at the time of the cruises, ties around trees is what I understand. So why wasn't there an obligation on the part of the government to ask an interrogatory, asking the commission to reconstruct the cruised areas since there appears to have been testimony that that was possible? I don't recall that testimony. My understanding is – and I think the critical legal point here is Rules 26 and 37 of the CFC's rules put the burden on the commission to support their – provide the data underlying their expert report and their expert testimony. This is the fundamental data that we think justifies – that is underneath that testimony. And without them producing it or keeping it, I think if after the fact recreation in trials in 2008, the cruises occurred in 2000 and 2001, we're not – I've not looked at the testimony recently. I don't recall exactly what the – Well, for your – you can take a look at it while you're waiting for your rebuttal argument. It appears at 2039 in the appendix on page 1967 of the transcript. Any other questions at the moment? All right. Thank you, Mr. Landin. Thank you. It's time for rebuttal. Mr. Goodhart. May it please the court. I have two points to make regarding our takings judgment. First – Could you help us first with this pre-dam, post-dam comparison? Yes, sir. Is it fair to say that the parties agreed at the Court of Federal Claims to treat the deviations as a surrogate for comparing the effect of the dam and its operation with the pre-dam situation? Not exactly, Your Honor. No? There's evidence – there's, of course, evidence in the record of pre-dam time periods. But the parties – Your Honor, the parties both were looking at the deviation period as the major change. This bottomland hardwood forest has coexisted with the dam for – since the authorized plan was put in effect in 1953, the wildlife management – I don't understand why we should have a property right in the operation of the dam in a particular way. It doesn't make any sense to me. I mean, all these Supreme Court cases talked about the taking being the effect of building the dam and operating in a particular way. I don't think that you can say, well, once the dam is constructed, we have a property right in its operation in the same way that it's been operated in the past. Your Honor, we wouldn't say that we had a property right in it being operated in the sense that the Danforth case, for example, that the United States cites, Your Honor, they said there that when construction was done after the 1927 Flood Control Act, the legislation didn't create a taking. The construction of levees there along the Mississippi River didn't cause a taking when they were put in place. It was only when the United States would implement fused floods and flood a floodway would there be a taking. Judge Leto here, Your Honor, said that they— There would have to be a comparison to the situation before the levees were built. I mean, take a hypothetical. There's a construction of a dam, and before the dam there was flooding every month. The construction of the dam totally eliminates the flooding, the way it's being operated. And then they change the operation of the dam so that it permits flooding the same way it did before the dam was constructed. That's not a taking, right? Your Honor, there's not a taking if you eliminate the function of the dam. Here, Your Honor, this— But all you do is go back to the pre-dam situation. There's no takings claim, right? Your Honor, we've never tried to make a takings claim based on the dam being there since 1948. It had been operated as— Your Honor, I understand. The claim—the proper claim is they built the dam, and they then operated it in a particular way, and this is different from the situation that would have existed if the dam weren't there in the first place. That's the takings claim. But it has to be a comparison between the building of the dam that's operation compared to the situation that would exist without the dam. And I must disagree, Your Honor, that there was nothing with the dam's operation for its first 45 years that caused the flow agement to be taken across the commission's management. Look, if I understand the trial court's findings and what I thought to be the evidence in this case, there was also no showing that there was any material difference in the condition of your property, the property that you now own, between the pre-dam period and the post-dam period until 1992. That's exactly right. Which means that the parties, as I understand it, and certainly the trial judge, were treating the post-dam period up until 1992 as being equivalent to the condition at time immemorial, at least as long as the measurements had been made. Is that correct? That is correct, Your Honor. That whole time period that this forest, these hardwood oaks flourished, there was evidence when the inventory was done in 2000, 2001, that many of these trees were 80 to 100 years old. They're capable of living, some of them, to 150 years old. They had thrived under the authorized control plan, which in 1993 until 2000 we had consecutive years of summertime growing season flooding that this forest had not experienced anything of this kind before. Judge Leto had noted that this was unprecedented, that it had a profound disruption upon the management area and that it triggered what we had resulting in this basically catastrophic mortality. One of the experts had indicated that this went from a riverine, bottomland hardwood ecosystem to practically a headwater swamp is the way it was transformed. Those trees had never had this kind of inundation that they were subjected to that occurred in this series of deviations, six consecutive years, where there was over 65 days during the growing season every year. In many of those years it was even more, where these trees had warm weather, hot weather, deoxygenated water stagnating the root systems, and that is what triggered in 1999-2000 this massive brownout of trees dying. I think the photographs that are in the record are graphic evidence of this change that took place. Can I ask you a question about foreseeability? As I understand the Court of Federal Claims' opinion, it dealt directly with foreseeability and what the Court of Federal Claims said, that the government heard complaints from the Commission about flooding and that those complaints should have led it to conduct a survey to see whether there was unanticipated flooding in those areas. Is that a fair statement? It is, Your Honor. The problem I have is that the Court of Federal Claims also said that in 1993 the common wisdom, or whatever the phrase was, was that the deviations weren't going to cause a problem. My understanding of the record is that the complaints from the Commission did not begin until 1995 or 1996, so how could it have been foreseeable before the complaints were received? In other words, in the 1993-1994 period, didn't this only become foreseeable when the Commission made the complaints in 1995 or 1996? Well, Your Honor, a couple of things. The complaints did start after 1993. In 1994, when there was an ad hoc committee in which our Commission... I didn't find that in the record. Are you able to show me where that is? There's testimony from Mr. Robert Zachary in the transcript, and I can point you to that. If I can have a couple of minutes, I can point you to that. But definitely by 1995-1996, there's correspondence, and there's, again, attendance at meetings where the correspondence, the memos from Mr. Zachary, Mr. Armstrong... You're absolutely right. In 1995 and 1996, there were complaints. Yes, Your Honor. The Court of Federal Claims said that should have led the government to investigate and conduct a survey. That all makes perfect sense. My problem is with the 1993-1994 period because, as I read the record, there weren't any complaints in 1993 and 1994, and during that period of time, it may be that the flooding and damage was not foreseeable. Well, Your Honor, I think it would be foreseeable, and I think Judge Leto, in finding that it was, went to the Cottonland case about what engineers, basically, if they investigate, are capable of predicting. Sure. As soon as the commission made complaints, the engineers could have investigated and could have found out. That makes sense. But before the complaints, the Court of Federal Claims says, well, everybody thought there wouldn't be a problem. If I understand the facts, and correct me if I'm getting this wrong because this gets into the tree biology, but I thought your evidence was that these oaks, especially, could have withstood two or three years of excessive and lengthy flooding, but the multiple years beyond that did them in. So is it the case that complaints made in 1995,  would have been in time if the court had acted then on those complaints to avoid the injury? Most definitely, you're right, Judge Bryson, that the experts testified not all oaks could take one, maybe even two years, not three. Overcut oaks, not four. But during that time period when these objections were being made, Your Honor, there was time to stop and to avert the destruction. I think what I would point to Judge Dyke is that in the Water Control Plan itself, the authority behind that, the Act and also this Code of Federal Regulations that's referenced there says that if any change is going to be made in that control plan, it's going to be analyzed. And with the deviations specifically, it says the control plan says that each condition should be analyzed on its merits for sufficient data before the deviation is done. The United States Corps of Engineers, they're experts in flood control and hydrology. They could have looked. They could have done and confirmed a simple test that was done in 2001. Come and see. Well, the problem is that under the Court of Federal Claims' own findings, nobody in 1993 would have anticipated this as being a problem. And I think it was an assumption, Your Honor, that in this flood control in the watershed, there was an assumption not defended and not reasonably made that the effects of the water dissipated at the state line. That was never a defended assumption. They had the whole watershed to protect with this dam. And, yes, 110 miles downriver, crusts of water reach this area and affect this area and affect below this area. And so it was, as Judge Leto found, it was direct, natural, and probable that the results of these deviations got water to this area, raised the stage of the river there, and kept it high throughout the spring, into the summer, where no drainage could occur from this area. It was above the data and the record shows the river was above five-foot levels record number days. Above six-foot record number, and Judge Leto pointed out, above eight to ten and a half feet in that river where the management area was greatly flooded. Most of the management area was flooded at this eight to ten and a half foot warning level. So the United States should have been heeding the warnings and the objections that, come and see, this is what is being done to this property. You're going to kill the trees. One of the foresters that testified, Mr. Zachary, said this was like predicting a train wreck. He was the one helping make objections at meetings, putting them in writing, having them go to the Corps of Engineers. There was still time. They could have averted this before 1999 and 2000. At that point, it was too late. Destruction. It was a massive brownout across a 7,000 acre area. Very large. And then even beyond that, there were still trees that were destroyed and degraded. One expert said over 100,000 trees, 18 million board feet of timber lost. The habitat has now been taken over with invasive wetland species, button bush that has been aged, that has grown up in the undergrowth that's been aged to this 93 to 99 time period. It's a mess. And the people that enjoy this resource don't have what had thrived as a bottomland hardwood ecosystem that's fairly rare now in segments such as this, in this Mississippi Plyway. And so that's why we need and we're asking that, yes, even the regeneration costs, that's the only thing that we're asking that Judge Leddow did not find where he held us to a legal certainty as to the proof of the amount of damages when he in fact found that we had proved entitlement for this 6,990 acre area. Your Honors, my points are that the correct legal analysis was applied here by Judge Leddow and the Supreme Court confirmed that, and Judge Leddow made detailed findings of fact that established the physical taking and those findings are not clearly erroneous. This court should affirm those findings and award the additional regeneration costs on the commission's cross-appeal. He applied the Ridgeline test, which in the United States, in page 25, footnote 3 of their brief, principal brief, said that that was in fact the correct standard from Ridgeline with the legal analysis. The Supreme Court opinion did not change the legal analysis for the physical takings. Ridgeline is still good. Under Ridgeline, the court must look, is the government's invasion direct and foreseeable and is the interference with the owner's protected property interest substantial? That's what Judge Leddow actually, that's what he did. An 11-day trial, 18 witnesses, hundreds of exhibits, he specifically found that the government foreseeably imposed floods on this area from 1993 to 1998 unlike anything it had experienced before. He found that they had, the floods had destroyed the 18 million board feet of timber and it so profoundly disrupted certain regions of the management area that the commission could no longer use those regions for their intended purposes. Can I ask you a couple questions about the cruise maps? Yes, Your Honor. If Kingston, if a Kingston supervisor had appeared as an expert witness here to testify, the cruise maps would have been material that had to be produced under Rule 26. Is that correct? Your Honor, we would say that it did not have to be produced under Rule 26 in that those were, first this was done way five years before litigation. Well, let's assume, but it was done in anticipation of litigation. Well, let's assume that, okay? Yes, Your Honor, we'll assume that. And that it was done in anticipation of litigation to produce evidence that could be used to support the commission's claim. My hypothetical is Kingston, the Kingston supervisor testified as to these cruises and what was found in them. Would the cruise maps not be material that had to be produced under Rule 26? My answer is no, Your Honor, it would not. Why is that? Because first these were not, Kingwood did not intend to even retain those. They were guides to help keep individuals. But they would have been material that was considered by the expert, right? No, that information was not considered by the experts. Those maps to guide people on the ground were never used by the experts. They did not have information. They were used to create the material. As I understand it, and I've looked at the record, what Kingston supplied to Baker was lists saying in this particular area these were the number of healthy trees, these were the number of damaged trees, correct? There were five compartments, correct, five compartments that were inventoried in 2000. And you can't tell within those areas where this cruise took place, right? The maps would not have shown you, other than showing you the boundaries of each of the five compartments. They would not, as the United States has tried to maintain, would not have had the information on these maps that they claim because one of the cruisers who did testify, Mr. Livingston, explained very clearly these maps were to guide the individuals in the transects or directions. They were not putting plots on these maps, according to Mr. Livingston and Mr. Foster. What they were doing is they were putting stakes in the ground with flagging and they were marking the plots. I thought the cruise maps did identify the plots. No, no, Your Honor. Where do I see that in the record? At trial, Mr. Livingston testified. Can you show me there? Yes, Your Honor. That's not my recollection of the testimony. I may be wrong. I think what I can do is I can find for you, if I have a moment, I can find for you in the joint appendix where Mr. Livingston said that maybe what these cruisers would do at the end of the day is they would put the last plot on their map so that the next day they could know where to start. They were not putting each plot on these maps, not at all. When you say not each plot, what you just said is consistent with my recollection of the evidence that they were marking where they stopped each day so that they know where to start the next day. Wouldn't that be helpful in knowing what areas were subject to investigation at what times? That would in itself really not help the United States go back and reconstruct. What would have helped and they could have done is the stakes with flagging and the plot number on every stake was put into the ground. They were given the full report from Kingwood with all the information. That was handed to the Colonel with the Corps on February 14, 2001. They had it. If they wanted to go verify anything from that cruise, they could have because it was done just the fall before, and there were stakes in the ground everywhere where those plots were taken. Those 8 1⁄2 by 11 pieces of paper, as Mr. Livingston testified, could not have had every one of these plots, and they didn't retain them because they didn't think they needed them for anything. What you're saying is that the areas that were cruised could have been reconstructed. Do you remember I asked government counsel about that? Yes, Your Honor, you did, and it certainly could have been. They could have been reconstructed. The United States didn't attempt to ever try to do anything of that nature, and they wanted to complain about this, but those maps were not what they thought. They would not have had any additional information that would have zeroed them in to each of these plot locations. They did have, again, what was provided from the cruiser, the chief cruiser that testified, Mr. Livingston. He said all of the other cruisers were available. They were all still available. He could tell them all the directions that they cruised, and the United States deposed Mr. Livingston twice, Mr. Foster twice, Mr. Baker twice before trial. Who was Foster? Mr. Foster did the appraisal from Kingwood Forestry, and Mr. Livingston was the head of the crew that did the cruises. Let me ask you one other question about this. As I understand it, the way this was done, there were two control areas that were chosen, which had higher elevations, the theory being that the higher elevations wouldn't have been flooded, there wasn't any tree damage in those areas, and you compared the tree situation between the control areas and the other areas. Is that a fairly accurate statement? It is, Your Honor. So I looked at the information about the elevations of the control areas and the other areas, and I find that the elevations in the other areas, to some extent, exceeded the elevations of the control areas. That's fair too, right? Certainly, and I think along the river itself there may have been some places that did that. Yeah, so the problem to which we're addressing ourselves about the cruise maps is that if some of the areas that were cruised were at the higher elevations, that is elevations similar to the control areas, then those shouldn't have been included in the study, right? No, Your Honor, I don't think that would be correct. Why wouldn't that be correct? Well, I think it was these compartments when they were cruised, and this was the first timber inventory was of 6,990 acres, and the second was of the surrounding larger area, but they took the whole part of the compartments and they cruised all of it, whether the elevation was lower or higher. The two control areas that you mentioned did have higher elevation where they generally were not subjected to, except the highest maybe, the highest of floods. But otherwise, Your Honor, I think they felt it was representative of these areas. I do have, Your Honor, the site to the Joint Appendix. It's at page 2035. Mr. Livingston there was asked at trial about the purpose of the maps. He said they were just for the cruisers' benefit to know where access points were, where any creeks, drains, or sloughs were, to give them an idea of what the boundary of each area would be because when they could just mark off each line they cruised or what plot was on the ending or the beginning of each line. So it did show plot information for the ending and the beginning. It showed lines, Your Honor. It had lines, but it did not have plot information, I believe, according to Mr. Livingston. He said at the end of the two weeks, these 8 1⁄2 by 11 pieces of paper, which were just used to keep these folks focused and from getting lost, they were used to swap mosquitoes. They didn't retain these for any purpose. Were they instructed not to cruise the higher elevations that were similar to the control areas? I think, Your Honor, that what you're getting into as far as higher areas, I don't think the evidence was that there was any really other areas as high as the control areas. There's maybe a total of 20 feet that changes across this area. Dr. Heitmeyer testified it was like a washboard. There were ridges all through, low and high. And some of the species of timber could change within just a matter of even six inches. But the band of nut all and overcup oaks was largely in a zone of about 2 1⁄2 feet across this management area. And those were the ones that were basically wiped out. Your Honor, I think what I've said, the United States might like to— they don't like the facts. They might ask you to relitigate the facts. But the record indicates there's substantial facts to support what Judge Leddow made and very specific, detailed findings that follow the ridgeline analysis. We think that there's just not clear error that's been proven for any of those findings to be overturned. Do you agree that the Arkansas water rights law could be relevant here? Your Honor, that is too late. No, no, I understand that. But if it had been raised, it would be relevant, right? Well, Your Honor, not the way it was raised. They cite to Harris— If they properly raised it, it would be a relevant consideration. And I think it would be relevant with a very short consideration because Arkansas water law, the DeVore Farms case that we cite, the Arkansas Supreme Court has recognized that whether it's natural or whether it's reasonable use or whatever the riparian doctrine, Arkansas law says one riparian can't obstruct or interfere with the flow of water where it's going to damage another riparian owner and impair or destroy the other riparian owner's interest. That would be a very short consideration of that issue, Your Honor, because I think the law, which was not briefed there, is very clear that the Game and Fish Commission as a riparian owner would not have to have those kinds of trespasses of water on its land that would destroy its use and its temper. I think I'm over my time. I think if I— Any other questions? Okay. Thank you, Mr. Goodhart. Thank you, Your Honor. Okay, Mr. Lindman, have your rebuttal time. I'd like to touch on the cruise issue quickly at the beginning here. Mr. Livingston was the head of the cruise team. He looks like he did a little cruising. What he said was, are you able to identify on the areas you cruise where you started your lines? I might be able to approximate where I started on one or two of them. So there was no testimony from Mr. Livingston that he could recreate the cruise. He said they could reconstruct. Right? Are you able to— Are you able to identify where other cruisers started their lines? No, ma'am, but they could, though. I think it's unrealistic that nine years later that anyone else would have a better understanding or memory of this than Mr. Livingston did. Well, I guess the question is whether the government should have asked the commission to reconstruct the areas that were cruised. They couldn't have sent the people out in the field to find the markings that existed. Why shouldn't the government have the burden of asking the commission to reconstruct the cruised areas? I think two reasons. Rules 26 and 37 put the burden on the commission to provide the data to underline their expert reports. If you compare what they did here with respect to this cruise with respect to what they do with cruises that support their timber sales, and the record we briefed says—I won't belabor it, but it's clearly different. They keep the cruise maps. They audit the cruises. They double-check. This cruise in 2001, there's no cruise maps. An audit's not possible after the fact. And the timing here is cruising in 2000. They sue us in 2005. Trial's in 2008. The missing cruise maps surface closer to trial. It's six or seven years since flags and stakes were put in the ground. I don't think it's realistic to assume that those could have been recreated. Well, suppose we were to agree with you. What should we do about it? You say that evidence is exfoliated, their expert testimony should be struck, and you remand to the district, the CFC, to see what's remaining of the case. So that's the revenue we see here. We're not seeking an order of dismissal, but rather that that evidence should go because underlying facts supporting it has always been missing. How much—this was unclear to me from the record and the briefs. How much information did you have about the areas that were cruised? My understanding is we had that it's a 1,500-acre plot that was cruised. We know where that plot is, but we don't know where the damaged trees within that plot were located. And within that 1,500—so each plot that was cruised is 1,500 acres, right? I don't know about each, but I— Roughly. Okay. I would like to double-check the space in the brief, but I think it was 1,500 acres. All right, all right. So you knew roughly what areas were cruised. And the cruise maps, in your view, would have shown what incremental information that the 1,500-acre cruise plot would not have given you? We would have known a start end point and a line. We would have been able to say in that line it went through an area that in 1991 they had found beaver damage, so attributing that to the deviations in error. It would have shown that it went over a ridge above which it would not have flooded, so any damage in that tree— So are you telling me that what you would have done is to take the starting point on day three and the ending point on day three, if those were marked on the cruise map, and said, well, you can draw a line between those and we can go back and look at the trees along that line? Is that the pertinence of this information? I think there's two points. It's pertinent to whether that area would have flooded during the deviations and how frequently, and then whether there was preexisting damage to those trees. But was there evidence at trial that did the government do that? Well, we couldn't do that because we didn't have the start point or end point, and so we didn't know. We had a count of trees, which they provided to their expert, Mr. Baker,  Was there a government expert testimony that these trees didn't really die? No, but we don't know why they died, and we shouldn't have to pay damages for the trees that may have died because of insect damage, preexisting flood damage, or beaver tail damage versus the deviation damage, and that's the point. Of course, the court made findings as to the other causes, other potential causes, finding that they were insignificant in the great scheme of things. Right, but the court can't. The data is missing, so we can't. We couldn't double-check that. Their expert said, don't worry, there's no other problems, but that's what we wanted to double-check, and that's what the cruise maps would have allowed us to do. Do you think the cruise maps would have put you in a position to contradict the evidence on which the district court found that beavers and insects were not a significant factor in the area as a whole? It might have, because their records show damage in specific areas, and what we don't know is did the cruise go through that area or not, and so I think that would have allowed us to do that. I think we've exhausted your time. Is there one last sentence that you'd like to leave us with? I would like one last sentence. The idea that I think when they say the property was in good shape beforehand and not in good shape afterwards, I think that just reasons from the damage question here, but the Supreme Court's factors don't focus just on damage but focus on the four I mentioned, and that's what you need to look at before you get to the question of whether there was substantial damage or not. Okay. Thank you, Mr. Lundman and Mr. Peres, because you've taken a new position. That concludes my argument today. All rise.